EAGLEMED, LLC, a Delaware limited liability company, Med–Trans Corporation, a North Dakota corporation, Air–Methods Corporation, a Delaware corporation, and Rocky Mountain Holdings, LLC, a Delaware limited liability company, Plaintiffs,

v.

State of WYOMING, EX REL., DEPARTMENT OF WORKFORCE SERVICES, WORKERS' COMPENSATION DIVISION, Joan K. Evans, in her official capacity as Director of the Wyoming Department of Workforce Services, John Ysebaert, in his official capacity as Administrator of the Wyoming Department of Workforce Services, Office of Standards and Compliance, and Pete Simpson, in his official capacity as Senior Management Consultant and Deputy Administrator, Provider Services of the Wyoming Department of Workforce Services, Workers' Compensation Division, Defendants.

Case No. 15–CV–26–ABJ

United States District Court, D. Wyoming.

Signed May 13, 2016

Filed 05/16/2016

Order denying motion to amend judgment June 13, 2016

---

Richard A. Mincer, Hirst Applegate LLP, Bradley T. Cave, Joanna R. Vilos, Holland & Hart, Cheyenne, WY, Matthew J. Smith, pro hac vice, Holland & Hart, Denver, CO, for Plaintiffs.

Charlotte M. Powers, Wyoming Attorney General's Office, Michael J. Finn, Wyoming Attorney General, Cheyenne, WY, Timothy W. Miller, Wyoming Attorney General's Office, Casper, WY, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, UNITED STATES DISTRICT JUDGE

The plaintiffs' *Motion for Summary Judgment* (Doc. No. 29) and defendants' *Motion for Dismissal, or in the Alternative, Summary Judgment* (Doc. No. 31) are before the Court. After reviewing the parties' submissions, the record on summary judgment, the applicable law, and being fully advised, the Court finds that the plaintiffs' *Motion for Summary Judgment* (Doc. No. 29) should be **GRANTED** and the defendants' *Motion for Dismissal, or in the Alternative, Summary Judgment* (Doc. No. 31) should be **DENIED** for the reasons stated below.

This case concerns whether the Airline Deregulation Act of 1978 ("ADA") preempts the Wyoming Department of Workforce Services, Workers' Compensation Division's rate schedule for compensating air ambulance entities. First, the Court will give a factual background, discussing the relationship between the plaintiffs, air ambulance entities, and the defendants, the State of Wyoming, the Division, and the named state officials. Next, the Court will present the standard of review, followed by an analysis of the law and facts as to the cross motions for summary judgment. Finally, the Court will conclude by discussing the disposition of this case.

## BACKGROUND

The plaintiffs provide air ambulance services in the State of Wyoming as well as throughout the United States. (Doc. No. 30–2, p. 3; Doc. No. 30–3, p. 3). They deliver emergency air transportation for critically ill or severely injured patients to the closest appropriate hospital when requested by first responders or third–party medical professionals. *Id.* The plaintiffs employ paramedics and nurses to treat patients during transportation. *Id.*

The plaintiffs fit into various regulation schemes. They hold operating certificates issued by the Federal Aviation Administration ("FAA") under Parts 119, 135, and 298 of the agency's regulations. *Id.* In addition to federal regulation, the State of Wyoming licenses the plaintiffs as air ambulance operators. *Id.* Although the plaintiffs have no current issue with the State of Wyoming's licensing scheme, they do take issue with Wyoming's Workers' Compensation Act and the regulations promulgated by the Division thereunder with regard to air ambulance compensation. (Doc. No. 23).

The Airline Deregulation Act was enacted in 1978, focusing on "efficiency, innovation, and low prices" for the airline industry.

In 1978, however, Congress enacted the ADA, which sought to promote "efficiency, innovation, and low prices" in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition." 49 U.S.C. §§ 40101(a)(6), (12)(A). While the ADA did not repeal the predecessor law's saving provision, it included a preemption provision in order to "ensure that the States would not undo federal deregulation with regulation of their

own." *Morales supra,* at 378, 112 S.Ct. 2031. In its current form, this provision states that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." § 41713(b)(1). *Northwest, Inc. v. Ginsberg,* — U.S. —, 134 S.Ct. 1422, 1428, 188 L.Ed.2d 538 (2014). Under the Airline Deregulation Act, states cannot enact or enforce laws related to the price, route, or service of an air carrier. *Id.*

Under Wyoming Statute Section 27–14–401(e), "[i]f transportation by ambulance is necessary, the [D]ivision shall allow a reasonable charge for the ambulance service at a rate not in excess of the rate schedule established by the director under the procedure set forth for payment of medical and hospital care." Pursuant to the statute, the Division adopted a fee schedule that lists reimbursement rates to medical providers, including air ambulances. The fee schedule concerning air ambulances is located in Chapter 9 of the Rules, Regulations and Fee Schedules of the Wyoming Workers' Compensation Division. Section 8 of that Chapter lists the maximum allowable rates for air ambulances.

- Code A0430–Air, Fixed Wing: $3,350.00;
- Code A0431–Air, Rotary Wing: $3,900.66;
- Code A0435–Mileage, Air, Fixed Wing: $10.30 per statute mile; and
- Code A0436–Mileage, Air, Rotary Wing: $27.47 per statute mile.

Wyo. Admin. Code WSD WCD Ch. 9, § 8 (2015).

The plaintiffs have been submitting bills for payment to the Division and its officials since September of 2012. (Doc. Nos. 30–2, 30–3). The submitted bills have been for a much higher amount than the regulatory rate. *Id.* The Division responds to these bills by paying only the regulatory rate. *Id.*

The Division denied payments to EagleMed and Med–Trans in the total of $209,329.01 as of May of 2014.

- $21,822.17 for service provided on December 7, 2012;
- $29,202.70 for service provided on May 19, 2013;
- $28,189.08 for service provided on June 19, 2013;
- $27,540.50 for service provided on July 30, 2013;
- $30,256.37 for service provided on July 31, 2013;
- $44,629.25 for service provided on September 6, 2013; and
- $27,688.94 for service provided on April 23, 2014.

(Doc. No. 30–2, p. 4). The Division denied Air–Methods Corporation ("AMC") and Rocky Mountain Holdings ("RMH") compensation totaling more than $1,500,000.00 as of August 7, 2015. (Doc. No. 30–3, p. 4). The Division indicated to the plaintiffs that it would continue to deny any requests for compensation above the regulatory rates. (Doc. Nos. 30–2, 30–3).

On February 18, 2015, the plaintiffs filed their *Complaint for Declaratory Judgment* (Doc. No. 1) requesting that this Court declare the above statute and regulations preempted by federal law, entitling the plaintiffs to full compensation for the air ambulance services from the Division. On June 18, 2015, the plaintiffs filed their *Amended Complaint for Declaratory Judgment and Injunctive Relief* (Doc. No. 23) adding state officials and a claim for injunctive relief that would prevent the defendants from enforcing the statutes and regulations at issue in the future. The plaintiffs request declaratory relief, asking

the Court to declare that the Division's statutes and regulations enforcing air carrier rates are preempted, the Division cannot regulate the air ambulances, and the Division cannot prevent the air ambulances from billing patients directly. (Doc. No. 23, pp. 10–11). The plaintiffs request injunctive relief barring the Division from enforcing the current statutes and regulations at issue and promulgating any future regulations related to air carrier rates. *Id.*

On June 29, 2015, the defendants filed their *Answer and Counterclaim for Declaratory Judgment* (Doc. No. 27) responding to the plaintiffs' allegations and counterclaiming for declaratory judgment in their favor. The defendants asserted that the plaintiffs are barred from bringing any declaratory judgment or injunctive action against them in federal court under the principles of state sovereign immunity. (Doc. No. 27, p. 8). Further, the defendants counterclaimed for declaratory relief in their favor, arguing that neither express nor implied preemption invalidates the pertinent portions of the statutes and regulations, among other things. *Id.* at 9–11. The claim for declaratory relief included a request that this Court declare that the defendants can prohibit the plaintiffs from billing patients covered by workers' compensation for any overages. *Id.* at 11.

On August 7, 2015, the plaintiffs filed their *Motion for Summary Judgment* (Doc. No. 29) and brief in support thereof (Doc. No. 30), arguing that the Court has jurisdiction to decide this case, the statute and regulation are preempted as they relate to air carrier rates, and the defendants' defenses are not applicable. On August 28, 2015, the defendants filed their *Motion for Dismissal, or in the Alternative, Summary Judgment* (Doc. No. 31)

and brief in support thereof (Doc. No. 32), arguing that the Court does not have subject matter jurisdiction for five alternative reasons and the statute and regulations are not preempted.[1] On September 11, 2015, the plaintiffs filed their response to the defendants' motion, contesting every argument made therein. (Doc. No. 33). On September 18, 2015, the defendants provided supplemental authority from the District of Colorado. (Doc. No. 34). On September 30, 2015, the plaintiffs provided supplemental authority from the Southern District of Florida. (Doc. No. 37). On November 3, 2015, the defendants provided more supplemental authority, this time from the Texas State Office of Administrative Hearings. (Doc. No. 41).

The Court held the hearing on cross-summary judgments on December 11, 2015, taking the matter under advisement at the conclusion of the hearing. The plaintiffs have since provided supplemental authority from the District of North Dakota, and the defendants have provided their response thereto. (Doc. Nos. 43, 44).

## STANDARD OF REVIEW

█ Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court con-

---

1. The Court notes that the defendants' motion to dismiss was not timely and, even if it had been, the factual evidence presented would require the Court to convert the motion to a motion for summary judgment. Therefore, the Court will treat the motion as one for summary judgment.

siders the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn" in the non-movant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

■ The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

■ Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine dispute of material fact for trial. *See Travis v. Park*

*City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

■ When considering a motion for summary judgment, the court's role is not to weigh the evidence and decide the truth of the matter, but rather to determine whether a genuine dispute of material fact exists for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Credibility determinations are the province of the fact-finder, not the court. *Id.* at 255, 106 S.Ct. 2505.

## DISCUSSION

Given the complexity of this case and the number of arguments offered on each side's behalf, a roadmap is helpful before beginning discussion. First, the Court will address the jurisdictional question: whether this Court, in the face of state sovereign immunity under the Eleventh Amendment, can hear this case and controversy against the State of Wyoming, the Division, and its officials. Second, the Court will discuss the defenses raised by the defendants. Third, the Court will address the declaratory relief requested by the plaintiffs and defendants. Fourth, the Court will address the plaintiffs' claim for injunctive relief. After ending its discussion, the Court will conclude with a summary of the practical effects of the decision.

### I. The Court possesses subject matter jurisdiction to issue injunctive and declaratory relief in this matter.

■ Before stepping into the discussion on sovereign immunity, the Court first acknowledges that it has subject matter jurisdiction over this federal question. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Subject matter jurisdiction is proper under these facts.

A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question over which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

*Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96 n.14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In addition, federal courts have federal question jurisdiction in cases where parties sue state officials for declaratory judgment and injunctive relief. *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635, 642, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331.

**II. State sovereign immunity under the Eleventh Amendment does not bar the plaintiffs from suing the named state officials in this Court for injunctive and declaratory relief, because this matter falls under the *Ex parte Young* exception.**

 The Eleventh Amendment to the United States Constitution was adopted in 1795 and formally ratified in 1798. *Employees of Dept. of Public Health and Welfare, Missouri v. Dept. of Public Health and Welfare, Missouri*, 411 U.S. 279, 280, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). The Eleventh Amendment explicitly protects states from being sued by citizens of other states or foreign states in federal court.

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Implicitly, the Eleventh Amendment also protects a state against suit by its own citizens in federal court. *Hans v. Louisiana*, 134 U.S. 1, 10, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

 The Eleventh Amendment does not destroy this Court's original jurisdiction at inception. *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998). The Eleventh Amendment "grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Id.* The State has the opportunity to raise or waive the defense. *Id.* A court can ignore the issue of immunity under the Eleventh Amendment, unless the State raises the defense. *Id.* The defendants in this case have raised the defense.

When a state does raise this defense, plaintiffs may avoid it through exceptions. The three exceptions discussed in the parties' briefing are enforcement of the Fourteenth Amendment, state waiver, and the *Ex parte Young* exception: suit for prospective declaratory and injunctive relief against state officials. The Fourteenth Amendment and state waiver exceptions were discussed by the defendants but were not raised by the plaintiffs. The Court does not find these two exceptions worthy of discussion, given the facts in this case. The Court will focus its attention on the *Ex parte Young* exception.

*Ex parte Young*

In 1907, the Minnesota legislature passed a law regulating railroad rates and creating serious penalties for noncompliance. *Ex parte Young*, 209 U.S. 123, 127, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Before Minnesota began enforcing the law, railroad company stockholders sued railroad companies in federal court to enjoin the companies from complying with the law. In addition, the stockholders named Edward T. Young, the Attorney General of Minnesota, as a defendant, requesting that he be enjoined from seeking to enforce the law.

*Id.* at 129, 28 S.Ct. 441. Young objected to the lawsuit, claiming state immunity under the Eleventh Amendment. *Id.* at 132, 28 S.Ct. 441. The federal court issued the temporary restraining order and preliminary injunction against enforcement. *Id.* at 133, 28 S.Ct. 441.

The next day, Young sued in state court, requesting a writ of mandamus forcing the railroads to comply with the law. *Id.* at 133–34, 28 S.Ct. 441. Because of his actions, the federal court found him guilty of contempt, fined him, and jailed him until he would dismiss the writ. *Id.* at 134, 28 S.Ct. 441. Young did not dismiss the writ and filed an action for habeas corpus with the Supreme Court of the United States, alleging unlawful confinement because the injunctive relief which he violated was not valid for multiple reasons, including state immunity under the Eleventh Amendment. *Id.* at 126, 144, 28 S.Ct. 441.

With these facts before it, the Court upheld the contempt and injunctive relief, stating the reasons for this exception to immunity under the Eleventh Amendment.

> The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to

the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States. *See Re. Ayers,* 123 U.S. [443] 507, 31 L.Ed. [216] 230, 8 Sup.Ct. Rep. 164 [ (1887) ]. It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality, with reference, at least, to the Federal Constitution, be first raised in a Federal court, that court, as we think is shown by the authorities cited hereafter, has the right to decide it, to the exclusion of all other courts.

*Id.* at 159–60, 28 S.Ct. 441.

The rule in *Ex parte Young* has been explained in a sentence. "A federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land." 17A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 4232, 145–47 (3rd ed. 2007). The current lawsuit concerns the plaintiffs' claim that the state statutes and regulations are contrary to a federal statute that is the supreme law of the land: the Airline Deregulation Act. This case fits directly into the *Ex parte Young* mold.

The *Ex parte Young* doctrine has evolved over the years. In the interest of brevity, the Court will not take a case-by-case approach, given the number of cases explaining and elaborating on *Ex parte Young.* In 2002, the Supreme Court of the United States recognized that state offi-

cials are not immune from claims for prospective declaratory relief, in addition to prospective injunctive relief. *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 646, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The *Verizon Maryland* Court also explained the standard of review in *Ex parte Young* cases.

> [i]n determining whether the doctrine of *Ex parte Young* avoids Eleventh Amendment bar to suit, *a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'*"

*Id.* at 645, 122 S.Ct. 1753 (emphasis added) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)). Using this standard, the Court looks to plaintiffs' *Amended Complaint for Declaratory Judgment and Injunctive Relief*. (Doc. No. 23).

■ Part of the relief sought by the plaintiffs is retrospective and some is prospective. The plaintiffs request monetary damages for past underpayment. This request for payment of damages suffered in the past must be denied. The plaintiffs request relief against the State of Wyoming and the Division. This relief, even prospective, must be denied, because the plaintiffs can only sue state officials in their official capacity for declaratory and injunctive relief. This leaves the Court with the plaintiffs' claims for prospective injunctive and declaratory relief against the state officials, which the Court will address in the next section of the discussion.

■ The defendants' arguments contending that the state officials are immune under the Eleventh Amendment do not prevail. The defendants contend that the plaintiffs have not satisfied the three prong test used to determine whether the plaintiff's complaint is sufficient: (1) whether the case is against state officials or the state itself; (2) whether the complaint alleges an ongoing violation of federal law; and (3) whether the relief sought is prospective relief. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012).

■ First, the State and the Division were named as defendants along with the state officials, but this Court is not considering relief against the State and Division as discussed above. Therefore, the plaintiffs are suing the proper defendants for these purposes. Second, the *Amended Complaint for Declaratory Judgment and Injunctive Relief* alleges an ongoing violation of federal law. (Doc. No. 23). The state officials are enforcing a statute and regulation against the plaintiffs, and the plaintiffs have a non-frivolous, substantial claim for relief. *See Pruitt*, 669 F.3d at 1167. The plaintiffs claim that the state statute and regulation are preempted by the Airline Deregulation Act through the Supremacy Clause of the Constitution. (Doc. No. 23). Third, the Court is only considering the plaintiffs' claims for prospective relief. All three prongs of the test are satisfied.

The defendants argue that, in very general terms, this suit is entirely against the state, even though the officials are named. If the defendants' argument held water, no official could ever be sued under the *Ex parte Young* doctrine. It is clear that *Ex parte Young* is a legal fiction. 17A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 4231, 139–40 (3rd ed. 2007). If state officials seek to enforce state statutes or regulations preempted by federal law, they are acting contrary to the supreme law of the land. The state officials are not immune from the plaintiffs' prospective injunctive and declaratory claims for relief. The Court can move forward to the merits of the plaintiffs' claims for prospective injunctive

and declaratory relief and the defendants' counterclaim for prospective declaratory relief.

### III. The Court finds the defendants' numerous alternative defenses not applicable in this case, requiring the Court to assess the merits of preemption.

#### a. This lawsuit presents a proper case and controversy under 28 U.S.C. § 2201.

The defendants argue that plaintiffs do not present a case or controversy. The plaintiffs contend they have shown the existence of a case or controversy. The Court agrees. "[F]ederal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement. So long as the plaintiff faces a credible threat of enforcement, redressability is generally not an obstacle . . . ." *Consumer Data Indus. Association v. King*, 678 F.3d 898, 905 (10th Cir. 2012) (citations omitted). Plaintiffs have faced more than a threat of enforcement. The fee schedule has been enforced against them, and they have challenged enforcement at the Division level, only to have that case stayed pending the outcome of this action.

The injury here is the failure to award full payment for the plaintiffs' air ambulance services. The causal connection between the injury and the conduct is clear on its face. The plaintiffs have not received full payment for services because the defendants are denying payment based on the Division's fee schedule. The injury can be redressed by a favorable court decision. If the statute and regulations are preempted, the defendant officials cannot continue to enforce them, which in turn would cause the Division to pay the billed rate or seek the Wyoming Legislature's amendment of the statutes to allow the injured employees to pay the remaining bill.

#### b. This lawsuit does not violate the political question doctrine.

The defendants contend that the Court would violate the political question doctrine if it issued an order in this case. The defendants argue that a court decision on the adequacy of what the defendants pay the plaintiffs is a legislative and executive decision, making it a political question. The political question doctrine is a narrow exception to the rule that Courts should decide cases properly before them.

In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia*, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821). Our precedents have identified a narrow exception to that rule, known as the "political question" doctrine. *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). We have explained that a controversy "involves a political question ... where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). In such a case, we have held that a court lacks the authority to decide the dispute before it.

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012).

The Court cannot find a "textually demonstrable constitutional commitment" of this issue to a different branch of government. In addition, a clear standard is present for the Court to decide the issue: the

Supremacy Clause, the statutory and regulatory language, and the common law. This Court would not be engaging in non-judicial discretion, because it would not be setting the rates for each air ambulance flight. This Court would be telling the defendant officials in their official capacity that they cannot enforce the statute and regulation to set air ambulance rates. This is not a political question case.

The defendants have cited one case where a court declared an issue to be a non-justiciable political question. *See e.g. Velvel v. Johnson*, 287 F.Supp. 846 (D. Kan. 1968) (involving a lawsuit to declare the war in Vietnam unconstitutional). The plaintiffs are not asking the Court to declare a war unconstitutional or anything remotely analogous. There are six types of successful non-justiciable political question defenses: (1) republican form of government and electoral process; (2) foreign relations; (3) Congress's ability to regulate its internal processes; (4) process for ratifying constitutional amendments; (5) instances where federal courts cannot create effective equitable relief; and (6) the impeachment process. ERWIN CHEMERINSKY, FEDERAL JURISDICTION, 146 (3d ed. 1999). None of these are present. This case is not barred by the narrow political question doctrine.

### c. This lawsuit is not barred by the doctrines of estoppel and laches.

■ The plaintiffs have been doing business in Wyoming since 2007 and 2008 and submitting bills to the defendants as early as 2012. The current regulations have been in effect for six years. The defendants contend that waiting six years justifies dismissal based on the doctrine of laches.

■ Dismissal on laches requires proof of unreasonable delay and harm or prejudice to the defendants. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The defendants argue that the nearly six years from enactment of these regulations to the filing of this case is unreasonable, showing plaintiffs' lack of diligence. The defendants claim the prejudice is the lack of evidence (memory of witnesses, loss of proof) over these years. The defendants state that much of the evidence for this case has been lost because defendants only retain records for five years.

The defendants' briefing alludes to losing evidence without any proof of actual prejudice. This case is about the Constitution, the state statutes, and the state regulations. This case is not about retrospective relief. Although records may not have been retained beyond a five year period, the legislative and regulatory history is available. The delay is not unreasonable and no prejudice has been suffered by the defendants during this delay. In fact, the defendants took advantage of the delay for six years and received discounted air ambulance services.

The defendants also argue that the plaintiffs are estopped from attempting to challenge past application of the statutes and regulations. This argument is moot and does not need to be addressed by this Court, because past monetary damages against the defendants will not be awarded in this case.

### d. This lawsuit is not destructive of traditional state authority.

■ The defendants argue that preemption in this case would destroy traditional state authority over public health and medical service regulation under the Tenth Amendment. The plaintiffs assert that these regulations relate to air carrier prices; not medical care. The defendants suggest that the state acted pursuant to its police power to protect public health and welfare by promulgating these rates. The defendants argue that all medical care on

the air ambulances is subject to regulation by the state. The issue here is price. It is not safety or training and performance of ambulance personnel.

■■■■■ The Tenth Amendment to the United States Constitution reserves for the states the powers not delegated to the federal government ·by the Constitution. *Kelley v. U.S.*, 69 F.3d 1503, 1509 (10th Cir. 1995). "If power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. U.S.*, 505 U.S. 144, 155–156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Under the Commerce Clause, Congress can regulate three general areas: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) the activities substantially affecting interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Congress's power over the channels and instrumentalities of interstate commerce includes the power to regulate air carriers and navigable airways. *See Ickes v. FAA*, 299 F.3d 260, 263 (3rd Cir. 2002). Because Congress was delegated this power in the Commerce Clause, "the Tenth Amendment expressly disclaims any reservation of that power to the states," and defendants cannot regulate air carrier rates in a cloak thread from the health and safety police powers. *See Rowe v. N.H. Motor Transport Association*, 552 U.S. 364, 374–75, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008). For these reasons, a decision in favor of the plaintiffs is not destructive of traditional state authority.

### e. The McCarran–Ferguson Act does not apply in this case.

The defendants contend that the McCarran–Ferguson Act reverse preempts the Airline Deregulation Act because the workers' compensation system in Wyoming, as a whole, is the "business of insur-

ance." The plaintiffs argue that in no way, shape, or form is the Wyoming workers' compensation system the "business of insurance" as contemplated by the McCarran–Ferguson Act.

■■■■ The McCarran–Ferguson Act was enacted to ensure that states maintain their preeminent role in regulating the insurance business. *See* 15 U.S.C. § 1011. The McCarran–Ferguson Act prevents the federal government from preempting state regulation of the business of insurance, unless the federal law directly relates to the business of insurance. 15 U.S.C. § 1012. The pertinent question is whether Wyoming's workers' compensation program is the "business of insurance." Three non-exclusive factors are considered when deciding whether the Wyoming workers' compensation system regulates the "business of insurance."

> *[F]irst*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in itself . . . .

*Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (emphasis in original). With these factors in mind, the Court analyzes the facts in this case.

The Wyoming workers' compensation system was enacted to "provide a worker's benefit system . . . to assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to the Worker's Compensation Act.... The worker's benefit system in Wyoming is based on a mutual renunciation of common law rights and defenses by employers and employees alike." Wyo.

STAT. ANN. § 27–14–101. The workers' compensation system is a three-party relationship. The Division holds the benefits in a type of trust relationship. *See* WYO. STAT. ANN. § 27–14–701 (establishing the workers' compensation account, which holds funds paid in). Some investment is allowed, but only that amount above what is immediately necessary to maintain a sufficient balance to compensate claims. WYO. STAT. ANN. § 27–14–701(c). The employer pays into the account based on industry classification and the employer's payroll report. WYO. STAT. ANN. § 27–14–202. The employee receives benefits directly from the account. WYO. STAT. ANN. § 27–14–701.

In its most basic form, the workers' compensation system is distinguishable from a two-party insurance contract between insurer and policyholder and is analogous to a trust administered by a trustee (the Division) for the benefit of the beneficiaries (employees) with the trust property of the settlor (the employer). No party is defined as the policyholder in this situation. The workers' compensation program spreads all three parties' risks, not just one. The employee benefits from coverage for the risk of injury, the employer benefits from coverage for the risk of liability to the employee, and the State of Wyoming benefits from less litigation in its courts, stable businesses, and protection for covered workers. Now that the Court has addressed the overarching theme of this regulatory system, it will look with more depth at whether the state is regulating the "business of insurance" with its workers' compensation system.

■ The first factor, spreading a policyholder's risk, weighs in the plaintiffs' favor. It may seem like the Court is splitting hairs and being overly technical, but this highly detailed look at "whether the [Wyoming workers' compensation system] has the effect of transferring or spreading a policyholder's risk" was recognized in *Pireno*. In *Pireno*, the Court applied the first factor in the following way.

Plainly, ULL's use of NYSCA's Peer Review Committee plays no part in the "spreading and underwriting of a policyholder's risk." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. at 211, 99 S.Ct. at 1072. Both the "spreading" and the "underwriting" of risk refer in this context to the transfer of risk characteristic of insurance. See n. 7, *supra.* And as the Court of Appeals below observed:

> "The risk that an insured will require chiropractic treatment has been transferred from the insured to [ULL] by the very purchase of insurance. Peer review takes place only after the risk has been transferred by means of the policy, and then it functions only to determine whether the risk of the entire loss (the insured's cost of treatment) has been transferred to [ULL]—that is, whether the insured's loss falls within the policy limits." [*Pireno v. New York State Chiropractic Ass'n,*] 650 F.2d [387] at 393 [ (2d Cir. 1981) ].

Petitioner ULL argues that the Court of Appeals' analysis is "semantic and unrealistic." Brief for Petitioner ULL 17. Petitioner reasons that "[i]t is inconceivable that Congress would have included risk transfer within the 'business of insurance' but excluded a device that helps 'determine whether the risk … has been transferred' and acts as 'an aid in determining the scope of the transfer.'" *Ibid.* We find no merit in this argument, because the challenged peer review arrangement is logically and temporally unconnected to the transfer of risk accomplished by ULL's insurance policies. *The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at*

*the time that the contract is entered.* See 9 G. Couch, Cyclopedia of Insurance Law §§ 39:53, 39:63 (2d ed. 1962). If the policy limits coverage to "necessary" treatments and "reasonable" charges for them, then that limitation is the measure of the risk that has actually been transferred to the insurer: To the extent that the insured pays unreasonable charges for unnecessary treatments, he will not be reimbursed, because the risk of incurring such treatments and charges was never transferred to the insurer, but was instead always retained by the insured. Petitioner's argument contains the unspoken premise that the transfer of risk from an insured to his insurer actually takes place not when the contract between those parties is completed, but rather only when the insured's claim is settled. *This premise is contrary to the fundamental principle of insurance that the insurance policy defines the scope of risk assumed by the insurer from the insured.* See *id.,* at § 39:3; R. Keeton, Insurance Law § 5.1(a) (1971).

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 130–31, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (emphasis added). There is no insurance contract being regulated by Wyoming's workers' compensation system. The parties are bound by a statutory relationship and risk has never been contractually transferred to any of the parties. The workers' compensation system is not transferring or spreading a policyholder's risk, because no insurance contract and no policyholder exist.

▮ The second factor, whether the workers' compensation system is an integral part of the policy relationship between the insurer and the insured, weighs against the defendants as well. First, these facts do not contain a policy relationship between insurer and insured. As discussed above, there is no insurance contract, no policyholder, and no insurer receiving the transferred risk. Even if this case involved an insurance relationship, the workers' compensation system would not be considered an integral part of the policy relationship. Even if the workers' compensation system had some relation to the business of insurance, the defendants could not show that it is integral to the policy relationship. *See Pireno,* 458 U.S. at 132, 102 S.Ct. 3002 (indicating that even cost savings are insufficient to show a practice is integral to the policy relationship). This factor weighs against the defendants.

▮ The third factor, whether the practice is limited to entities in the insurance industry, is clearly in the plaintiffs' favor. The *Pireno* Court analyzed this factor as follows.

We may assume that the challenged peer review practices need not be denied the § 2(b) exemption *solely* because they involve parties outside the insurance industry. But the involvement of such parties, even if not dispositive, constitutes part of the inquiry mandated by the *Royal Drug* analysis. As the Court noted there, § 2(b) was intended primarily to protect "*intra*-industry cooperation" in the underwriting of risks. 440 U.S. at 221, 99 S.Ct. at 1078 (emphasis added). Arrangements between insurance companies and parties outside the insurance industry can hardly be said to lie at the center of that legislative concern. More importantly, such arrangements may prove contrary to the spirit as well as the letter of § 2(b), because they have the potential to restrain competition in noninsurance markets. Indeed, the peer review practices challenged in the present cases assertedly realize precisely this potential: Respondent's claim is that the practices restrain competition in a provider market—the market for chiropractic services—rather than in an insurance market. App. 8a.

Thus we cannot join petitioners in depreciating the fact that parties outside the insurance industry are intimately involved in the peer review practices at issue in these cases.

*Pireno,* 458 U.S. at 133–34, 102 S.Ct. 3002. In *Pireno,* arrangements between insurance companies and parties outside the insurance industry weighed against the party holding the shield of McCarran–Ferguson reverse preemption. Here, the Court possesses heavier facts weighing against the defendants, because no party is part of the insurance industry. In fact, the insurance industry is not involved in this case, except for the defendants' claim that they are a government-run insurance agency. The workers' compensation system regulates a plethora of parties, a strong majority of which are outside of the insurance industry.

■ After weighing all three factors, the defendants cannot prevail on this issue. Wyoming's workers' compensation system does not regulate the "business of insurance." All the cases quoted by the defendants calling the workers' compensation system a type of insurance were not speaking directly to this issue. Those cases do not define the system as regulating the "business of insurance." The shield of McCarran–Ferguson must be set aside while the Court analyzes the merits of preemption pursuant to the Supremacy Clause and the Airline Deregulation Act.[2]

## IV. Because the Wyoming Workers' Compensation Act does not allow the plaintiffs to balance bill claimants, the statute and regulation at issue are directly related to air carrier prices. Therefore, the statute and regulation are preempted by the Airline Deregulation Act.

*The Workers' Compensation Act*

First, the Court must examine the effect of the Workers' Compensation Act on air ambulance billing practices. The issue is whether the air ambulance entities can bill an employee for the amount unpaid after the Division pays the amount allowed under its fee schedule.

Here is a short summary of how the facts might play out in any given workers' compensation case in Wyoming. An employee is working for an employer who is subject to the workers' compensation system. That employee is injured while working in the course and scope of "extrahazardous" employment. The injured employee is in a remote portion of Wyoming needing immediate medical attention. An air ambulance is summoned to the scene. The air ambulance flies the employee to a large hospital with the capabilities required to remedy the situation, or perhaps an air ambulance is called after the injured employee has been initially treated and must be trans-

---

**2.** The Court recognizes an alternative path of analysis on this issue, focusing on whether the ambulance rate schedule, not the entire workers' compensation system, is regulation of the "business of insurance." Businesses frequently seek to control costs by various measures, i.e., selecting service providers to provide service for less cost, using bulk purchase and early payment discounts, offering competitive bidding for service, or, as used here, attempting to declare a maximum price that will be paid. *See Group Life and Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067,

59 L.Ed.2d 261 (1979) (finding that pharmacy agreements lowering drug costs to insurance policyholders under a prescription plan was not the "business of insurance"). The "business of insurance" which is preempted by the McCarran–Ferguson Act is distinguished from the "business of insurance companies" which is not preempted. *Id.* When the defendants regulate the prices for air ambulance service that the plaintiffs may recover for providing service to injured workers, it is acting like any other business seeking to reduce its costs.

ported to a more skilled facility. The employee survives the accident but now must survive the medical bills. Luckily, workers' compensation covers the reasonable and necessary expenses.

Or does it? There is a limitation for ambulance services, requiring ambulance services to be a "reasonable charge" which is defined by the Division's fee schedules. WYO. STAT. ANN. § 27–14–401(e). The Division pays the air ambulance company based on its fee schedule for air ambulances. Wyo. Admin. Code WSD WCD Ch. 9, § 8 (2015). A substantial portion of the bill remains. Can the air ambulance bill the employee for the remaining balance or is the air ambulance limited to the fee schedule rate mandated by the Division? Is the air ambulance required to take a loss when it might not know beforehand that it was accepting a workers' compensation case?

The Workers' Compensation Act contains two provisions relating to billing an injured employee for treatment. One provision bans the practice of balance billing employees.

> Fees or portions of fees for injury related services or products rendered shall not be billed to or collected from the injured employee.

WYO. STAT. ANN. § 27–14–501. The other provision concerns decisions of compensability and the right to challenge the Division's determination.

> (b) Following review of each bill and claim for medical and hospital care pursuant to W.S. 27–14–401(b), the division may approve or deny payment of all or portions of the entire amount claimed and shall:
>
> (i) *Notify the employee and the health care provider in writing of any portion of a claim for which the employee may be liable for payment;*
>
> (ii) Provide the health care provider with a detailed monthly statement of respective claims and bills for services rendered and the amount approved for payment;
>
> (iii) Provide the employer with a detailed monthly statement of all medical and hospital claims affecting his experience rating.

WYO. STAT. ANN. § 27–14–601 (emphasis added). These two provisions do not appear to work in harmony. Under the first provision, fees or portions of fees cannot be billed to injured employees, but the second provision allows the employee to be liable for payment. The Court must examine the language of each of these provisions further to discern the legislature's intent.

Section 27–14–601 uses the terms "medical and hospital care" and "health care provider." The question is whether the air ambulance services are defined as a "health care provider" that is providing "medical and hospital care" under the Workers' Compensation Act. "Medical and hospital care" is defined as follows.

> *[W]hen provided by a health care provider* means any reasonable and necessary first aid, medical, surgical or hospital service, medical and surgical supplies, apparatus, essential and adequate artificial replacement, body aid during impairment, disability or treatment of an employee pursuant to this act including the repair or replacement of any preexisting artificial replacement, hearing aid, prescription eyeglass lens, eyeglass frame, contact lens or dentures if the device is damaged or destroyed in an accident and any other health services or products authorized by rules and regulations of the division. "Medical and hospital care" does not include any personal item, automobile or the remodeling of an automobile or other physical structure, public or private health club, weight loss center or aid, experimental

medical or surgical procedure, item of furniture or vitamin and food supplement except as provided under rule and regulation of the division and paragraph (a)(i) of this section for impairments or disabilities requiring the use of wheelchairs[.]

WYO. STAT. ANN. § 27–14–102(x)(ii) (emphasis added). The term "health care provider" is defined as "doctor of medicine, chiropractic or osteopathy, dentist, optometrist, podiatrist, psychologist or advanced practitioner of nursing, acting within the scope of his license, licensed to practice in this state or in good standing in his home state[.]" WYO. STAT. ANN. § 27–14–102(x). Under the ordinary usages of both of these terms, air ambulances provide medical and hospital care and would appear to be health care providers. But, under the specific statutory definition, the air ambulances do not fit either of these definitions.

The Court can discern from other markers in the Workers' Compensation Act that ambulance services are not considered "medical and hospital care" or "health care providers." Section 27–14–401 indicates this clearly. The term "medical and hospital care" is used throughout the first four subsections of this statutory section. *See* WYO. STAT. ANN. § 27–14–401(a)–(d). Subsection (e) of the statute, the very next subsection, governs the consideration of ambulance service charges.

If transportation by ambulance is necessary, the division shall allow a reasonable charge for the ambulance service at a rate not in excess of the rate schedule established by the director under the procedure set forth for payment of medical and hospital care.

WYO. STAT. ANN. § 27–14–401(e). This subsection uses the term "medical and hospital care," but not to describe ambulance services. It uses "medical and hospital care" as a comparison for how the Division

should set fee schedules for ambulances, indicating that they are two different items. In addition, the title of this statute section starts "Medical, hospital and ambulance expenses ...," separating ambulance expenses from medical and hospital expenses. Ambulance services are not "medical and hospital care" under the statute. Therefore, Section 27–14–601, the section allowing providers to bill injured workers, does not apply to air ambulances.

There are a myriad of circumstances that might lead to the denial of a claim for reimbursement. For various reasons, an injured person may not have been covered under the Act. The treatment furnished may not have been covered or was not necessary or reasonable. The injury may not have occurred on the job or the employer might not be qualified. No record has been provided that indicates that the defendants have treated payment of a lesser sum under the rate schedule as a denial of plaintiffs' claim for air ambulance services. No such record exists, because in the Division's opinion, payment of the reduced price under the fee schedule represented full payment under state law.

The statutory ban on balance billing the injured worker in Section 27–14–501 applies to the plaintiffs' air ambulance services. Under the current statutory and regulatory scheme, the air ambulance entities are limited in the amount of compensation they may receive for their services by the Division's fee schedule as implemented by the defendants.

*Relation to Air Carrier Prices*

■ The plaintiffs contend that the Airline Deregulation Act expressly preempts the statute and regulation at issue in this case. The defendants claim that the statute and regulation are not preempted. The statute and regulation the defendants are enforcing are preempted as

far as they relate to air carrier [air ambulance] rates.

 "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *See Arizona v. United States,* 567 U.S. 387, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012) citing U.S. CONST. art. VI, cl. 2. Federal law preempts state law when the federal government expressly preempts state law, when the federal government exclusively governs the area of law, or when state law is in conflict with federal law. *Id.* at 2500–01. Only one type of preemption is at issue in the parties' briefing: express preemption. When federal law contains a clause expressly preempting state law the Court must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting,* 563 U.S. 582, 131 S.Ct. 1968, 1977, 179 L.Ed.2d 1031 (2011) quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

The pertinent portion of the Airline Deregulation Act is below.

 **(a) Definition.**—In this section, "State" means a State, the District of Columbia, and a territory or possession of the United States.

 **(b) Preemption.**—(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

 (2) [Paragraph dealing with airlines in Alaska].

 (3) [Paragraph dealing with owners and operators of airports].

 (4) [Paragraph dealing with transporting property by air carrier].

49 U.S.C. § 41713. The preemption component of the Airline Deregulation Act has "a broad preemptive purpose." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The statute contains the phrase "related to" instead of "based on." *See Altria Group, Inc. v. Good,* 555 U.S. 70, 85–86, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) ("Our conclusion that the state-law claim was pre-empted turned on the unusual breadth of the ADA's pre-emption provision.").

The key issue is whether the defendants are enforcing a statute and/or regulation related to a price, route, or service of an air carrier under the Airline Deregulation Act. The Wyoming statute at issue reads as follows.

 If transportation by ambulance is necessary, the division shall allow a reasonable charge for the ambulance service at a rate not in excess of the rate schedule established by the director under the procedure set forth for payment of medical and hospital care.

WYO. STAT. ANN. § 27–14–401(e). Pursuant to the statute, the director set the rate schedules for ambulances. Wyo. Admin. Code WSD WCD Ch. 9, § 8 (2015). The current rate schedule reads as follows.

 Ambulance services shall be paid the lesser of the billed charge or the maximum allowable rate for the code appropriate for the documented service. The maximum allowable rates are all-inclusive. Mileage shall be reimbursed per documented loaded statute mile. See Chapter 9, Section 1 of these rules for additional guidelines.

 (a) The following codes shall be recognized by the Division:

| Code Short Descriptor | Maximum Allowable |
|---|---|
| A0425 Mileage, Ground | $ 8.60 per statute mile |
| A0426 Advance Life Support - 1 | $ 286.91 |
| A0427 Advance Life Support - 1, Emergent | $ 454.00 |
| A0428 Basic Life Support | $ 239.10 |
| A0429 Basic Life Support, Emergent | $ 382.54 |
| **A0430 Air, Fixed Wing** | **$ 3,350.00** |
| **A0431 Air, Rotary Wing** | **$ 3,900.66** |
| A0433 Advance Life Support - 2 | $ 657.50 |
| A0434 Specialty Care Transport | $ 777.93 |
| **A0435 Mileage, Air, Fixed Wing** | **$ 10.30 per statute mile** |
| **A0436 Mileage, Air, Rotary Wing** | **$ 27.47 per statute mile** |

*Id.* (emphasis added).

As stated in the Airline Deregulation Act, preemption only applies if the plaintiffs are "air carriers" providing air transportation under 49 U.S.C. §§ 41101 through 42303 ("this subpart"). "Air carrier" is defined as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." 49 U.S.C. § 40102(a)(2). "Air transportation" is defined as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." 49 U.S.C. § 40102(a)(5). Air carriers providing transportation under this subpart must acquire certificates pursuant to §§ 41101 through 41113.

■ The plaintiffs are "citizen[s] of the United States" because corporations are citizens under this Act. 49 U.S.C. § 40102(a)(15)(C). They are providing interstate air transportation. 49 U.S.C. § 40102(a)(5). The plaintiffs have certificates under Parts 119, 135, and 298 of the FAA regulations. The plaintiffs cite cases where courts have decided that plaintiffs

are "air carriers" under the Airline Deregulation Act. *See Hiawatha Aviation of Rochester, Inc. v. Minnesota Dept. of Health*, 389 N.W.2d 507, 509 (Minn. 1986) (holding that Minnesota's air ambulance licensing system was preempted, which indicates that the court found the air ambulance service to be an "air carrier" under the Airline Deregulation Act); *Med–Trans Corp. v. Benton*, 581 F.Supp.2d 721, 731–32 (E.D. N.C., West Div. 2008) (finding air ambulance service to be an "air carrier" under the Airline Deregulation Act). This Court finds that these air ambulance services are "air carriers" under the Airline Deregulation Act.

 The next issue is whether the defendants are applying a statute or regulation related to the price, route, or service of an air carrier. The language "related to" has a significantly broad reach. *American Airlines v. Wolens*, 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (holding that state consumer protection laws could not be invoked over the terms of airline's frequent flyer program). In *Morales v. Trans World Airlines, Inc.*, the broad preemptive purpose of the Airline Deregulation Act was found to preempt state regulation of air carrier advertising. 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The Airline Deregulation Act even preempts state-law claims for breach of the implied covenant of good faith and fair dealing in the face of a frequent flyer program. *Northwest, Incorporated v. Ginsberg*, —— U.S. ——, 134 S.Ct. 1422, 188 L.Ed.2d 538 (2014). Because the air ambulances cannot collect above the amount the defendants have set in their fee schedules,

the statute and regulations are directly related to air carrier prices.[3]

The fee schedule creates a loss that the carrier must recover from other members of the public who have the misfortune of needing air ambulance service. Reduced compensation received for air ambulance service provided to Wyoming's injured workers has had a significant and adverse impact upon the ability of the plaintiffs to receive compensation that reflects the cost of their operations. The plaintiffs have claimed substantial sums, reflecting the losses sustained for unpaid costs over the period that they have each provided service in Wyoming. The Division denied compensation to EagleMed and Med–Trans in the total of $209,329.01 as of May of 2014. (Doc. No. 30–2, p. 4). The Division denied AMC and RMH compensation totaling more than $1,500,000.00 as of August 7, 2015. (Doc. No. 30–3, p. 4). Air ambulance entities run businesses with unique challenges and considerations.

> Most emergency air ambulances operate on a 24/7/365 basis and must price their services in a way that will recover so-called cost of readiness: staffing the aircraft around the clock with a pilot and two medical attendants. Further, air ambulances have little control over the volume of transports they will do or how many of the completed transports they will get paid for. When setting their prices they must estimate their volume and mix of paying and nonpaying transports.

Diederich, *supra* at 71. The rapid response required in an emergency flight obviates

---

**3.** "While [the Civil Aeronautics Board] in some instances shared economic regulation of the airlines with the states, in the post-world of the Airline Deregulation Act of 1978, and in particular its federal preemption provision, the states are subject to an express-preemption measure that prohibits them from 'en-

act[ing] or enforc[ing]' any provision that 'relates to' the 'prices, routes, or services' of an air carrier in the sale and operation of its air transportation services." Bernard F. Diederich, *Air Ambulance, Rescuer or Rescuee?*, 62 JUL Fed. Law 66, 68 (2015), citing 49 U.S.C. § 41713.

any opportunity to negotiate price and terms.

A limited number of other jurisdictions have considered state regulation of air ambulance prices. The Wyoming workers' compensation system differs from other systems, so the Court takes the persuasive precedent with a grain of salt. However, it appears other states avoided this very issue altogether by not regulating air ambulances in workers' compensation regulations.[4]

The defendants argue that the fee schedule price is only the price the plaintiffs will receive from workers' compensation cases and does not account for other business outside of workers' compensation cases. This argument has appeal on its surface, but it appears to the Court unrealistic for the air ambulances to pick and choose whether they respond in an emergency. In addition, the Airline Deregulation Act preempts any law or regulation "related to" price. No exception exists for whether or not the air carrier voluntarily takes the business for preemption to be applicable.

The defendants make one final argument on this point. The defendants argue that the *Wolens* exception to ADA preemption applies because the plaintiffs voluntarily entered into a private contract with the defendants. *See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). In *Wolens*, the plaintiffs were participants in American Airlines' frequent flyer program. *Id.* at 224–25, 115 S.Ct. 817. The plaintiffs challenged the frequent flyer program un-

der the Illinois Consumer Protection Act ("ICPA") and under a theory of breach of contract. *Id.* at 224–26, 115 S.Ct. 817. The *Wolens* Court held that the ICPA claim was preempted by the Airline Deregulation Act, but not the breach of contract action. *Id.* at 228, 115 S.Ct. 817. The *Wolens* Court focused on the language "may not enact or enforce a law" to compare and contrast ICPA with the breach of contract action. *Id.* at 226–27, 115 S.Ct. 817. ICPA was state enacted, so by suing under ICPA, the law was being enforced. *Id.* at 227–28, 115 S.Ct. 817. The breach of contract action was another story.

> This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Id.* at 233, 115 S.Ct. 817. The *Wolens* Court distinguished the breach of contract action because it was based upon terms offered by airlines and accepted by passengers: private obligations not being enforced under state statute or regulation. *Id.* at 228–33, 115 S.Ct. 817.

Here, the State is claiming that the plaintiffs accepted reduced payments under the workers' compensation system for a period of time, thus making them subject to a private contract with the defendants based on past performance. The defendants claim that the plaintiffs accepted the offer of workers' compensation payments by accepting payment. This argument can-

---

4. *See* Administrative Rules of Montana, Rule 24.29.1433(11)(f) ("Air ambulances whose charter and certification is through the federal Department of Transportation will be paid at 100 percent of their usual and customary charges pursuant to federal law."); Nebraska Workers' Compensation Court, Schedule of Fees for Medical Services, Instruction No. 7 ("For services not covered by this schedule,

(e.g. ... ambulance services) the actual charge shall be paid in full ...."); Colorado Department of Labor, Division of Workers' Compensation, 7 CCR 1101–3, Rule 18–3(4) (ground ambulance fee schedule only); Utah Administrative Code, Workers' Compensation Rules—Medical Care, R426–8–2 (ground ambulance fee schedules only).

not prevail. First, the workers' compensation system was enacted and is being enforced against the plaintiffs. Because the defendants enacted and enforced these laws against the plaintiffs, this case is analogous to the ICPA claim in *Wolens*; not the breach of contract claim. Second, the Court does not have evidence of a contractual relationship between the parties. The plaintiffs are not receiving an offer of the fee schedule price before picking up an injured worker and agreeing to it by doing so. The plaintiffs are performing the work and requesting payment after the fact. Just because the plaintiffs have not challenged this fee over the period of a few years does not mean they have contracted to accept the fee schedule payment in the random workers' compensation cases they receive.

After determining that the air ambulance entities cannot balance bill patients, there is no doubt that the defendants are setting the maximum rate the air ambulances can charge and recover, making the statute and regulation related to air carrier rates. For this reason, Wyoming Statute section 27–14–401(e) and Chapter 9, Section 8 of the Rules, Regulations and Fee Schedules of the Wyoming Workers' Compensation Division are preempted as far as they set the rates air ambulances can charge.

### V. The plaintiffs are entitled to a permanent injunction.

In *Northwest Inc.* and *Wolens*, the Court analyzed Airline Deregulation Act preemption in a defensive context: a defendant using preemption as a defense to a claim. In *Morales*, the Court analyzed the Airline Deregulation Act in an offensive context: a plaintiff using preemption for declaratory and injunctive relief under *Ex parte Young*. The *Morales* Court stated as follows.

It is a " 'basic doctrine of equity jurisprudence that courts of equity should

not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' " *O'Shea v. Littleton*, 414 U.S. 488, 499, 94 S.Ct. 669, 677–678, 38 L.Ed.2d 674 (1974); *Younger v. Harris*, 401 U.S. 37, 43–44, 91 S.Ct. 746, 750–751, 27 L.Ed.2d 669 (1971). In *Ex parte Young*, 209 U.S. 123, 156, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908), we held that this doctrine does not prevent federal courts from enjoining state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." *When enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law. See id.*, at 145–147, 163–165, 28 S.Ct. at 447–449, 455–456.

We think *Young* establishes that injunctive relief was available here. As we have described, the attorneys general of seven States, including petitioner's predecessor, had made clear that they would seek to enforce the challenged portions of the guidelines (those concerning fare advertising) through suits under their respective state laws. And Texas law, at least, imposes additional liability (by way of civil penalties and consumer treble-damages actions) for multiple violations. See Tex. Bus. & Com.Code Ann. §§ 17.47, 17.50 (1987 and Supp. 1991–1992). Like the plaintiff in *Young*, then, respondents were faced with a Hobson's choice: continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law dur-

ing the pendency of the proceedings and any further review.

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (emphasis added). The *Morales* Court indicated that as long as the case qualifies for *Ex parte Young* relief, an injunction is warranted.

▇ Here, the enforcement actions have been occurring and are imminent in the future. The air ambulances will be summoned to various locations for emergency assistance without any knowledge of whether the injured party is an employee subject to the workers' compensation system. Each time they receive a workers' compensation case, they are only paid the fee allowed, which is in violation of federal law. In this way, the plaintiffs are being penalized for providing services. The plaintiffs have appealed the denial of fees to the Division, and those proceedings are currently stayed pending the resolution of this case. The facts here are analogous to *Morales* and *Young*. Therefore, the Court will enjoin the defendants.[5]

## CONCLUSION

Having determined that *Ex parte Young* allows for prospective declaratory and injunctive relief against the above named state officials, the Court concludes that the Airline Deregulation Act preempts Wyoming Statute section 27–14–401(e) and Chapter 9, Section 8 of the Rules, Regulations and Fee Schedules of the Wyoming Workers' Compensation Division to the extent the statute and regulation set compensation that air ambulances may receive for their services. The state officials are permanently enjoined from enforcing the statute and regulation against air ambulance services. Accordingly, it is therefore

**ORDERED** that the plaintiffs' *Motion for Summary Judgment* (Doc. No. 29) shall be, and is, **GRANTED**, it is further

**ORDERED** that the defendants' *Motion for Dismissal, or in the Alternative, Summary Judgment* (Doc. No. 31) shall be, and is. **DENIED.** It is further

**ORDERED** that the named state officials and their employees and agents are permanently enjoined from enforcing Wyoming Statute Section 27–14–401(e) and Chapter 9, Section 8 of the Rules, Regulations and Fee Schedules of the Wyoming Workers' Compensation Division against air ambulance services.

Judgment shall be entered accordingly.

## ORDER DENYING PLAINTIFFS' MOTION TO AMEND JUDGMENT

The plaintiffs' *Motion to Amend Judgment Pursuant to FED. R. CIV. P. 59(e)* (Doc. No. 52) is before the Court. After reviewing the parties' submissions, the pleadings, the Court's previous orders, the applicable law, and being fully advised, the Court finds that the plaintiffs' *Motion to Amend Judgment Pursuant to FED. R. CIV. P. 59(e)* (Doc. No. 52) should be **DENIED** because there is no clear error or manifest injustice that must be corrected. FED. R. CIV. P. 59(e).

Although the plaintiffs did not directly request retrospective damages, the evidence before the Court focused partially on past monetary damages. In the interest

---

**5.** The Court notes that in *Morales* the Supreme Court of the United States limited the scope of the injunction originally ordered by the trial court. *See Morales*, 504 U.S. 374, 382, 112 S.Ct. 2031. The *Morales* Court limited the scope because the trial court went beyond enjoining the challenged guidelines and enjoined the defendants from "initiating any enforcement action ... which would seek to regulate or restrict any aspect of the ... plaintiff airlines' air fare advertising or the operations involving their rates, routes, and/or services." *id.* This Court will only enjoin the defendants as to the challenged statute and regulation.

of being thorough, the Court discussed past monetary damages in the context of *Ex parte Young*. Under *Ex parte Young*, this Court does not possess jurisdiction to award past monetary damages. Therefore, when the Court entered the *Judgment* (Doc. No. 50) in this case—after requesting assistance from the parties at the May 19. 2016 hearing—the Court used the language "ORDERED, ADJUDGED, AND DECREED that the plaintiffs' claims for retrospective damages ... are DENIED" to indicate that this Court did not have jurisdiction under *Ex parte Young* to award the plaintiffs the past monetary damage they presented to the Court. The *Judgment* only denies plaintiffs' past monetary relief because this Court does not have jurisdiction to award such in a suit instituted under *Ex parte Young*. It is hereby

**ORDERED** that the plaintiffs' *Motion to Amend Judgment Pursuant to Fed. R. Civ. P. 59(e)* (Doc. No. 52) shall be. and is. **DENIED.**