David Puryear, Justice
This case arises out of a dispute over what reimbursement is due to appellant PHI Air Medical, LLC for its transporting of injured employees covered by workers' compensation insurance in Texas. The parties sought judicial review of a decision by the State Office of Administrative Hearings, and the trial court rendered a final judgment in favor of the appellee insurers-Texas Mutual Insurance Company, Hartford Underwriters Insurance Company, TASB Risk Management Fund, Transportation Insurance Company, Truck Insurance Exchange, Twin City Fire Insurance Company, Valley Forge Insurance Company, and Zenith Insurance Company (collectively "the Insurers"). Because we conclude that certain provisions related to rates that can be paid for air ambulance transports are preempted by the Airline Deregulation Act ("the ADA"), we reverse the trial court's judgment and remand the cause to the trial court for further proceedings.
Statutory and Procedural Background
In 1978, Congress enacted the ADA to encourage market competition, to advance efficiency and innovation, to lower prices, and to increase the variety and quality of air transportation services. Morales v. Trans World Airlines, Inc. , 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ; see 49 U.S.C. § 40101(a) (explaining policy considerations involved in deregulation). The ADA provides:
*808 (b) Preemption. Except as provided in this subsection, a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.
49 U.S.C. § 41713(b).
At the state level, under the Texas Workers' Compensation Act ("the Act"), see Tex. Lab. Code §§ 401.001 - 419.007, employers may elect to self-insure or to obtain private insurance coverage to cover on-the-job injuries to their employees, id. §§ 406.002(a), .003. Under the Act, workers' compensation insurance generally pays benefits to an employee injured on the job regardless of fault or negligence, and the employee waives the right to sue for her injuries. Id. §§ 406.031, .034. This case involves the following statutes and rules:
• section 413.011 of the Act, which (1) requires the Commissioner of Workers' Compensation to adopt policies and guidelines "that reflect standardized reimbursement structures found in other health care delivery systems" by using Medicare and Medicaid reimbursement methodologies and policies and by developing appropriate conversion and other adjustment factors, and (2) states that the guidelines "must be fair and reasonable and designed to ensure the quality of medical care and to achieve effective medical cost control," id. § 413.001;
• provisions governing the assessment of administrative penalties and sanctions for violations of the Act, id. §§ 415.021-.036;
• the administrative rule defining "maximum allowable reimbursement" ("MAR") that may be paid to a health-care provider and stating that certain health-care services shall be reimbursed in accordance with the Workers' Compensation Division's fee guidelines, a negotiated contract, or if neither applies, "a fair and reasonable reimbursement rate" consistent with section 413.011 of the Act, 28 Tex. Admin. Code § 134.1(e), (f) (Tex. Dep't of Ins., Medical Reimbursement); and
• the rule explaining that the MAR for certain coded services[1] shall be 125 percent of a particular Medicare fee schedule, 125 percent of the published Texas Medicaid fee schedule rate for that code if it is not included in the Medicare schedule, or, if neither applies, the "fair and reasonable" rate under section 134.1, as summarized above, itation index="10" url="https://cite.case.law/citations/?q=28%20Tex.%20Admin.%20Code%20%C2%A7%20134.1">id. § 134.203(d), (f) (Tex. Dep't of Ins., Medical Fee Guideline for Professional Services).[2]
*809 PHI provides air-ambulance services throughout Texas and elsewhere in the country. It is certified and regulated by the United States Department of Transportation pursuant to the Federal Aviation Act. When it is called upon to transport someone, it charges for that service by billing a "per-trip charge" and an additional charge for the miles transported. PHI and the Insurers disagreed on the amount that PHI could recover for its transport of injured workers covered by workers' compensation policies issued by the Insurers, and the issue was brought before the Division, as required by the Act. See Tex. Lab. Code § 413.031. The Division determined that the applicable provisions of the labor code and related rules were preempted by the ADA, and the Insurers appealed, requesting a de novo hearing at the State Office of Administrative Hearings. An Administrative Law Judge heard the matter and issued a final decision finding (1) that the federal ADA did not preempt the Act and (2) that PHI should recover 149% of the Medicare rate for such services. The Insurers and PHI sought judicial review, and the Division intervened. Following a hearing, the trial court signed a final order declaring that the ADA did not preempt the Act and that the Insurers could not be asked to pay more than 125% of the Medicare amount. PHI appealed.
Does the ADA apply to preempt the Act?
Our initial inquiry is whether the ADA preempts the Act, first addressing the Insurers' argument that PHI's services do not fall within the preemption provision. The preemption provision bars a state from enacting a law or rule "related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b-1).[3] The Insurers argue that PHI does not "provide air transportation" subject to preemption because it does not hold certificates under the specified subpart, Subpart II.[4]
Under Subpart II, "[e]xcept as provided in this chapter or another law," an air carrier "may provide air transportation only if the air carrier holds a certificate under this chapter." Id. § 41101(a). However, the Secretary of Transportation has the authority to exempt certain classes of carriers if he considers it necessary and "decides that the exemption is consistent with the public interest." Id. § 40109(c). As applicable here, the Secretary of Transportation has established "a classification of air carrier, designated as 'air taxi operators,' which directly engage in the air transportation of persons" but which "[d]o not hold a certificate of public convenience and necessity and do not engage in scheduled passenger operations." 14 C.F.R. § 298.3(a). We conclude that an air-ambulance service, as an air taxi operator, is an air carrier that may provide air transportation under Subpart II, 49 U.S.C. § 41101(a), while exempted from certain certification requirements, id. § 40109(c). We further conclude that the preemption provision applies to such carriers. See id="p810" href="#p810" data-label="810" data-citation-index="1" class="page-label">*810id. § 41713(b);[5] see, e.g. , Air Evac EMS, Inc. v. Cheatham , No. 2:16-CV-05224, 2017 WL 4765966, at *5 (S.D.W. Va. Oct. 20, 2017) (appeal filed Nov. 22, 2017) (noting that no other courts have ruled that air ambulances were not air carriers under ADA, observing that Department of Transportation licensed Air Evac as an air carrier, and holding "that Air Evac's practice of providing emergency air ambulance services indiscriminately when called upon by third party professionals, together with its certification as an air carrier by the DOT and court cases affirming this status, qualify Air Evac as an air carrier under the ADA"); EagleMed, LLC v. Wyoming ex rel. Dep't of Workforce Servs. , 227 F.Supp.3d 1255, 1277-78 (D. Wyo. 2016), aff'd in part, rev'd in part by EagleMed LLC v. Cox , 868 F.3d 893, 904 (10th Cir. 2017) (finding that air ambulances are "air carriers" under ADA); Med-Trans Corp. v. Benton , 581 F.Supp.2d 721, 732-33 (E.D.N.C. 2008) (holding that air ambulance service provider was common carrier subject to preemption provision).[6] Therefore, PHI, as a registered air taxi with all relevant and required certificates, is an air carrier under Subpart II.[7] We now turn to whether the provisions at issue are preempted.
Other courts that have considered the preemptive effect of the ADA have *811 noted the breadth of the language chosen by Congress. See, e.g. , Northwest, Inc. v. Ginsberg , 572 U.S. 273, 134 S.Ct. 1422, 1430, 188 L.Ed.2d 538 (2014) (noting that language of ADA's preemption provision, which applies to "a law, regulation or other provision having the force and effect of law" (emphasis added), is "much more broadly worded" than other legislation that expressly applies only to "a law or regulation"); Morales , 504 U.S. at 383-84, 112 S.Ct. 2031 (ADA's provision "express[es] a broad pre-emptive purpose"); Cox , 868 F.3d at 899 (quoting from Morales 's discussion of provision's broad purpose, 504 U.S. at 383-84, 112 S.Ct. 2031 ); Valley Med Flight, Inc. v. Dwelle , 171 F.Supp.3d 930, 940 (D.N.D. 2016) ("The phrase 'related to' in the ADA preemption clause has been construed very broadly."); Bailey v. Rocky Mountain Holdings, LLC , 136 F.Supp.3d 1376, 1380 (S.D. Fla. 2015) (observing that Supreme Court has "held that the [preemption] provision should be construed broadly and [has] described its purposeful 'sweeping nature' " (quoting Morales , 504 U.S. at 384-85, 112 S.Ct. 2031 )). We agree. The relevant statutes and rules set the rates that can be recovered by PHI, as an air carrier, for transporting patients. Under the plain language of the ADA preemption provision, the ADA preempts those statutes and rules as far as they attempt to regulate PHI's rates.[8] See, e.g. , Cox , 868 F.3d at 904 ; Cheatham , 2017 WL 4765966, at *6-8 ; Dwelle , 171 F.Supp.3d at 941-43 ; Benton , 581 F.Supp.2d at 736-39.
Does the McCarran-Ferguson Act "reverse-preempt" the Act?
We next ask whether the McCarran-Ferguson Act removes the Act from ADA preemption or "reverse-preempts" it. The McCarran-Ferguson Act provides:
(a) State regulation
The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
(b) Federal regulation
No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That ... the Sherman Act, and ... the Clayton Act, and ... the Federal Trade Commission Act, ... shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
15 U.S.C. § 1012.[9] The question we must answer is whether the relevant provisions *812 of the Act and its associated rules were enacted "for the purpose of regulating the business of insurance."[10] See itation index="39" url="https://cite.case.law/citations/?q=15%20U.S.C.%20%C2%A7%201012">id. In this inquiry, we are guided by the United States Supreme Court and federal courts that have explained what is meant by that language.
As explained by the Supreme Court, the focus of the McCarran-Ferguson Act is on "the relationship between the insurance company and its policyholders." U.S. Dep't of Treasury v. Fabe , 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). In other words, a statute that regulates the business of insurance is one that is aimed at protecting or regulating the relationship between the insurer and the insured. Id. (quoting Securities & Exch. Comm'n v. National Secs., Inc. , 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) ); see also Group Life & Health Ins. Co. v. Royal Drug Co. , 440 U.S. 205, 220-21, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("References to the meaning of the 'business of insurance' in the legislative history of the McCarran-Ferguson Act strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk."). A statute need not directly regulate "the business of insurance," such as by mandating certain terms of an insurance contract or setting premiums that may be charged by an insurer, to fall within the ambit of the McCarran-Ferguson Act. Fabe , 508 U.S. at 502-03, 113 S.Ct. 2202. "The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Id. at 505, 113 S.Ct. 2202 (quoting Black's Law Dictionary 1236, 1286 (6th ed. 1990)).
"Cases interpreting the scope of the McCarran-Ferguson Act have identified three criteria relevant to determining whether a particular practice falls within that Act's reference to the 'business of insurance': 'first , whether the practice has the effect of transferring or spreading a policyholder's risk; second , whether the practice is an integral part of the policy relationship between the insurer and the insured; and third , whether the practice is limited to entities within the insurance industry.' " Metropolitan Life Ins. Co. v. Massachusetts , 471 U.S. 724, 743, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (quoting *813 Union Labor Life Ins. Co. v. Pireno , 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) ).[11] A statute must do more than affect insurance companies-it must focus "on the relationship between the insurance company and the policyholder." See National Secs. , 393 U.S. at 460, 89 S.Ct. 564 (holding that statute focused on insurance company stockholders, not on "attempting to secure the interests of those purchasing insurance policies," and so fell outside McCarran-Ferguson Act); see also Kentucky Ass'n of Health Plans, Inc. v. Miller , 538 U.S. 329, 337-39, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) (noting in discussion of broader ERISA reverse-preemption that McCarran-Ferguson Act applies if law was enacted for purpose of regulating business of insurance, not simply if it affects insurance company's business). In determining whether the statutes and rules at issue should be considered laws enacted for the purpose of regulating the business of insurance, we consider how they fit within the overall framework of the Act. See Fredericksburg Care Co., L.P. v. Perez , 461 S.W.3d 513, 520 (Tex. 2015).
In Fabe , the Court determined that an Ohio statute that established the priority in which an insurance company's assets are distributed upon bankruptcy, placing governmental claims behind policyholders's claims and those of certain other creditors, fell within McCarran-Ferguson because it was "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy," and thus its purpose was "identical to the primary purpose of the insurance company itself: the payment of claims made against policies." 508 U.S. at 504-06, 113 S.Ct. 2202. In Royal Drug , the agreements at issue limited the prices participating pharmacies would be paid for drugs, thus minimizing the insurance company's costs and maximizing its profits, and as the Supreme Court observed, such agreements "may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the 'business of insurance.' " 440 U.S. at 214, 99 S.Ct. 1067. Further, those agreements were not between the insurance company and its insureds but between the insurer and pharmacies providing services to the insureds. Id. at 216, 99 S.Ct. 1067. And finally, in Pireno , a chiropractor attacked an insurance company's use of peer-review committees to determine whether the chiropractor's charges were reasonable charges for necessary care. 458 U.S. at 122-23, 102 S.Ct. 3002. The Court observed that the use of the peer-review committee did not spread or underwrite a policyholder's risk, was "distinct from [the insurer's] contracts with its policyholders," and was "not limited to entities within the insurance industry" because it involved "third parties wholly outside the insurance industry-namely, practicing chiropractors." Id. at 130-32, 102 S.Ct. 3002.
"The purpose of the Texas Workers' Compensation Act is to provide *814 employees with certainty that their medical bills and lost wages will be covered if they are injured." HCBeck, Ltd. v. Rice , 284 S.W.3d 349, 350 (Tex. 2009) ; see Tex. Lab. Code § 402.021 (goals of workers' compensation system are that each employee be treated with dignity and respect and that each injured employee have access to fair and accessible dispute resolution process, prompt and high-quality medical care, and services necessary to facilitate his return to employment; in implementing goals, system must promote safe and healthy workplaces and provide income and medical benefits in timely and cost-effective manner).[12] Employees benefit under the Act because they are saved the time and expense of bringing a common-law tort claim, and subscribing employers benefit because they are not subject to tort claims for job-related injuries. HCBeck , 284 S.W.3d at 350.
The specific statutes and rules at issue in this case attempt to limit the rates an air ambulance company may be reimbursed after transporting a workers' compensation claimant for medical care, which is part of the Act's goal to provide cost-effective medical care. And although the Act as a whole certainly relates to the insurance industry and contains provisions that may implicate the relationship between insurers and their insureds, the overall goals of the Act and these particular provisions are not specifically directed at the insurance industry, see Pilot Life Ins. Co. v. Dedeaux , 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), or the relationship between the Insurers and their policyholders, see Fabe , 508 U.S. at 501, 113 S.Ct. 2202. Instead, the overarching focus of the Act is on ensuring prompt medical care for injured workers without those workers having to resort to the legal system, not on the relationship between the Insurers and their policyholders.
As in Royal Drug , an injured employee's paramount concern is not payment arrangements or limits on the reimbursement due to an air ambulance for transporting him after an injury but instead that he obtains prompt and high-quality air-ambulance services if they are required. See 440 U.S. at 213-14, 99 S.Ct. 1067. Further, PHI is not "within the insurance entity" and instead is a health-care provider that deals with insurance companies to seek reimbursement for its services. See Pireno , 458 U.S. at 130-32, 102 S.Ct. 3002. The caps on air ambulance fees do not affect the relationship between the Insurers and subscribing employers or their injured employees. See Royal Drug , 440 U.S. at 215-16, 99 S.Ct. 1067. Nor do they act to underwrite or spread risks among the insureds-like the provisions at issue in Royal Drug , they serve to minimize the Insurers' costs and maximize their profits. See id. at 214-15, 99 S.Ct. 1067. Such cost savings may have an effect on the workers' compensation system overall, but that effect is attenuated enough that we cannot consider limits on the rates an air ambulance may charge for transporting *815 an injured employee to be "regulating the business of insurance." See id.
"Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the McCarran-Ferguson Act apply." National Secs. , 393 U.S. at 459-60, 89 S.Ct. 564. The statutes and rules in question here do not underwrite or spread policyholder risk and are not specifically directed at the "business of insurance" (as opposed to "the business of insurance companies"), but instead minimize the Insurers' costs, and thus are not subject to reverse preemption under the McCarran-Ferguson Act.[13] See Cox , 868 F.3d at 904-05 (stating that even if Wyoming workers' compensation system "establishe[d] a type *816 of insurance," statute and schedule-setting fees for air-ambulance services were not laws "regulating the business of insurance"); see also Life Partners, Inc. v. Morrison , 484 F.3d 284, 294 (4th Cir. 2007) ("The 'business of insurance' refers to the marketing, selling, entering into, managing, servicing, and performing of insurance contracts."); Dwelle , 171 F.Supp.3d at 944 (statute that effectively capped rate for air-ambulance services did not regulate insurance carriers or performance of insurance contracts, alter or affect policies between insureds and insurers, or limit itself to entities in insurance industry); Perez , 461 S.W.3d at 522 (citing Fabe and National Securities and explaining that practices falling within McCarran-Ferguson Act include fixing rates, selling and advertising policies, licensing of insurance companies and agents, writing of insurance contracts and actual performance of contracts).
We hold that the statutes and rules that attempt to regulate the reimbursement that may be obtained by PHI (1) are preempted by the ADA's prohibition on state attempts to regulate an air carrier's price, route or service and (2) are not "reverse-preempted" by the McCarran-Ferguson Act. We limit our decision to the rules and statutes related to reimbursement rates and explicitly do not address the balance-billing provision, as PHI has explained that it only attacks that provision in the alternative and that it would prefer to leave the balance-billing prohibition intact.
Conclusion
Because we conclude that the provisions related to the reimbursement due to air-ambulance service providers under the Act are preempted by the federal ADA and are not subject to reverse-preemption under the McCarran-Ferguson Act, we reverse the trial court's judgment and remand the cause to the trial court for further proceedings.[14]

Health-care services are assigned "codes" under the Healthcare Common Procedure Coding System, which allows for more consistent billing and reimbursement. See Centers for Medicare & Medicaid Servs., HCPCS-General Information, HCPCS Background Information, https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/index.html (last visited Jan. 9, 2018). The list includes more than 6,000 codes that encompass thousands of details related to the provision of health care. See https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS.html (last visited Jan. 9, 2018). For example, there are codes for a patient's left or right side, for intravenous versus subcutaneous administration of a drug, for the kind of wheelchair or wheelchair accessories provided, for various cancer screenings, for hospital admission, for different kinds of laparoscopic surgeries, for the administration of specific drugs, for the provision of various kinds of counseling services, and for speech or occupational therapy.

PHI also challenged the Act's prohibition on "balance-billing"-which is a health-care provider's billing of an injured employee for all or part of the cost of a provided service. Tex. Lab. Code § 413.042(a). However, in its reply brief, it states that it only attacks the balance-billing provision in the alternative and that it would prefer to see that provision left intact while the provisions related to the reimbursement schedule are struck.

The ADA defines an "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation," and "air transportation" as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." 49 U.S.C. § 40102(a)(2), (5).

The preemption provision is in Title 49, "Transportation," Subtitle VII, "Aviation Programs," Part A, "Air Commerce and Safety," Subpart II, "Economic Regulation."

In a letter related to whether the ADA preempts a county's attempts to impose certain requirements on air ambulance services, the Department of Transportation took the same position, stating that "an air ambulance operator ... that holds DOT economic authority to operate as a registered air taxi under 14 CFR part 298, along with an FAA air carrier operating certificate under 14 CFR part 135, is an 'air carrier' for purposes of the ADA preemption provision." Letter from Ronald Jackson, Assistant Gen. Counsel for Operations, Dep't of Transp., to Thomas Cook, Vice Pres. & Gen. Counsel, REACH Air Med. Servs., LLC (Feb. 25, 2016), located at https://www.transportation.gov/sites/dot.gov/files/docs/Reach% 20Letter% 20Final% 20OCR.pdf. The Attorney General of Texas has also observed that "[t]he preemption provision has been applied to air ambulance companies that are air carriers within the ADA definition." Tex. Att'y Gen. GA-0684, 2008 WL 4965344, at *2 (Nov. 20, 2008) (citing cases applying ADA to air ambulances).

See also Hughes Air Corp. v. Public Utils. Comm'n of Cal. , 644 F.2d 1334, 1337-38 (9th Cir. 1981) (holding "that Congress intended to include carriers exempted from [Civil Aeronautics Board] certification pursuant to section 416(b)(1) within the scope of the preemption provision"); Hiawatha Aviation of Rochester, Inc. v. Minnesota Dep't of Health , 389 N.W.2d 507, 509 (Minn. 1986) (holding under similar preemption provision that state was "preempted from controlling entry into the field of air ambulance service" when air carrier "registers under 14 C.F.R. § 298 to operate as an air taxi and is authorized by the CAB to provide an air ambulance service").

We likewise disagree with the Insurers' argument that the rates charged by PHI are not "prices" as contemplated by the ADA. The ADA defines "price" as a "rate, fare or charge," 49 U.S.C. § 40102(a)(39), and regardless of whether PHI is paid lowered charges under certain circumstances, its billed rate cannot be considered anything other than a "price." See Valley Med Flight, Inc. v. Dwelle , 171 F.Supp.3d 930, 942-43 (D.N.D. 2016) (provisions that had effect of capping reimbursement for air ambulance services could only be considered to directly impact prices and services under ADA); Tex. Att'y Gen. GA-0684, 2008 WL 4965344, at *2-3 (noting that ambulance subscription program "involves an annual fee and a reduced charge for air ambulance services" and that because "[t]he regulation of the subscription program is related to the price of air ambulance services," ADA preempted statutes and rules "to the extent these provisions relate to rates charged by air carriers providing air ambulance services"). If PHI receives an artificially low payment for its provision of services, a rate not reasonably tied to market costs such as fuel and other costs specific to air ambulances, its "rates" as billed to recipients not a part of the workers' compensation market will have to change to cover such losses.

We reject the Insurers' argument that we should parse Congressional intent in greater detail through a policy-related lens. Although we agree with the Cox court's observations about the ADA's intent as it relates to the setting of air-ambulance rates, see EagleMed LLC v. Cox , 868 F.3d 893, 903-04 (10th Cir. 2017), the fact remains that the ADA preemption clause explicitly states that any state attempts to regulate an air carrier's rates or services are preempted. See ids="12266345" index="106" url="https://cite.case.law/f3d/868/893/#p904">id. As for whether Congress knew that air ambulances would be subject to the ADA, we agree with PHI that the discussion about the possible inclusion of a subsidy to upgrade air ambulance safety seems to indicate that Congress had that knowledge when it enacted the ADA. Further, we disagree with the Insurers' assertions that the provision of air ambulance services is not subject to market forces. Although such services are not "shopped around" by the injured person before the service is provided, the record contains evidence that the market does influence the rates an air-ambulance provider will charge.

For an explanation of the history and purpose behind the McCarran-Ferguson Act, see U.S. Department of Treasury v. Fabe , 508 U.S. 491, 499-500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), and Group Life & Health Insurance Co. v. Royal Drug Co. , 440 U.S. 205, 217-20, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

We note that the Administrative Law Judge stated that the reimbursement provisions were a "non-severable part" of the overall Act. We disagree. "The test for severability in the absence of an express severability clause is one of legislative intent." Association of Tex. Prof'l Educators v. Kirby , 788 S.W.2d 827, 830 (Tex. 1990). The overall Act is largely not subject to preemption and can be given effect separate and apart from the specific rate-setting provisions at issue here. See ids="10012406" index="114" url="https://cite.case.law/sw2d/788/827/#p830">id. at 830-31 (quoting Texas & P. Ry. Co. v. Mahaffey , 98 Tex. 392, 84 S.W. 646, 648 (1905) ). There is no indication that the Legislature would not have passed the Act without the rate provisions as they apply to air ambulances or that the Act cannot function without those provisions as applied here. See itation index="117" url="https://cite.case.law/citations/?q=84%20S.W.%20646">id. ; Rose v. Doctors Hosp. , 801 S.W.2d 841, 850 (Tex. 1990) (Phillips, C.J., dissenting) ("The inquiry, therefore, is whether 'the invalid part is so intermingled with all parts of the act as to make it impossible to separate them, and so preclude the presumption that the Legislature would have passed the act anyhow.' " (quoting Sharber v. Florence , 131 Tex. 341, 115 S.W.2d 604, 606 (1938) )); see also Anderson v. Abbott Labs. , No. 3:11-CV-1825-L, 2012 WL 4512484, at *6 (N.D. Tex. Sept. 30, 2012) (discussing severability in context of preemption).

Pireno and Royal Drug both dealt with "the scope of the antitrust immunity located in the second clause of § 2(b)" of the McCarran-Ferguson Act, not the broader first clause at issue in this case. Fabe , 508 U.S. at 504, 113 S.Ct. 2202 ; see Union Labor Life Ins. Co. v. Pireno , 458 U.S. 119, 126, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) ; Royal Drug , 440 U.S. at 231-32, 99 S.Ct. 1067. However, despite their antitrust focus, Pireno and Royal Drug are often cited for their discussions of factors to consider in determining whether a statute regulates the business of insurance, see, e.g. , Kentucky Ass'n of Health Plans, Inc. v. Miller , 538 U.S. 329, 337-39, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) ; Pilot Life Ins. Co. v. Dedeaux , 481 U.S. 41, 50-51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) ; Metropolitan Life Ins. Co. v. Massachusetts , 471 U.S. 724, 743, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), and we consider those factors in our analysis.

See also In re Poly-America, L.P. , 262 S.W.3d 337, 349-50 (Tex. 2008) (orig. proceeding) ("The Texas Workers' Compensation Act was enacted to protect Texas workers and employees. The Texas Legislature enacted the original Workers' Compensation Act in 1913 in response to the needs of workers who, despite a growing incidence of industrial accidents, were increasingly being denied recovery. In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law." (citations omitted)).

The Insurers argue that the fee statutes and rules relate to the performance of an insurance contract and fall within McCarran-Ferguson. However, the focus in our inquiry is on the relationship between the Insurers and their insureds-the insurance contracts require the Insurers to provide coverage for job-related injuries-not the relationship between the Insurers and the providers of medical care. The means of payment or the rates paid by the Insurers to the health-care providers for providing medical services under such coverage do not equate to the performance of the contracts themselves.
As for the cases cited by the Insurers as examples of the application of the McCarran-Ferguson Act in the workers' compensation context, many involved disputes related to the formation of the actual insurance policies. See, e.g. , Uniforce Temp. Pers., Inc. v. National Council on Comp. Ins., Inc. , 87 F.3d 1296, 1297-98 (11th Cir. 1996) (involving complaint related to alleged price-fixing of premiums for workers' compensation policies); In re Workers' Comp. Ins. Antitrust Litig. , 867 F.2d 1552, 1554 (8th Cir. 1989) (addressing dispute related to regulation and alleged price-fixing of insurance premiums); National Union Fire Ins. Co. v. Seneca Family of Agencies , 255 F.Supp.3d 480, 483 (S.D.N.Y. 2017) (concerning dispute related to terms to be included in documents forming insurance contract). And in Proctor v. State Farm Mutual Automobile Insurance Company , the court determined that alleged price-fixing between insurers as to rates paid for certain auto repairs were subject to reverse-preemption because the agreements were strictly "intra-industry" and because the cost of repairs did not merely affect premiums but was "directly related to the calculation of premiums; it is virtually a part of the ratemaking process." 675 F.2d 308, 322, 324 (D.C. Cir. 1982). Even assuming we were bound or persuaded by the Proctor opinion's application of Royal Drug , we are not persuaded that the rates paid to air-ambulance services are likely to have a "virtual ratemaking" effect on the workers' compensation insurance market.
Finally, Cox , as noted above, supports our conclusion, 868 F.3d at 904-05, and Brown v. Cassens Transport Co. , 546 F.3d 347 (6th Cir. 2008), does not provide useful guidance in this case. Brown discusses the Michigan workers' compensation system, observing that the benefits can be seen as a form of insurance, "thus perhaps creating an insurance-like relationship in which the employer is the 'insurer' and the employee is the 'insured,' " and also that certain provisions of the act in question regulate how an employer can self-insure, which "could be seen as part of 'the business of insurance.' " 546 F.3d at 359. However, the Brown court concluded that viewing the benefits as a form of insurance is "solely a matter of appearance" and concluded that because an employer already owed its employees a duty under common law to compensate the employee for workplace injuries, the system "merely creates a legislative remedy regarding the tort-liability relationship between employees and their employers, not an insurance contract." Id. at 359-60. The court discussed the purpose underlying the Michigan act, noting that it was focused on "providing certain recovery to employees for workplace injuries while limiting employers' liability rather than the regulation of insurance." Id. at 360. The court then noted that, although some provisions in the act did relate to the business of insurance (such as regulations setting required coverage in policies and prescribing certain terms that must be included), the employer involved was self-insured and thus the case implicated no insurer-insured relationship. Id. at 361. We do not read Brown as particularly helpful to our analysis, although its discussion of the underlying purpose behind Michigan's workers' compensation system lends supports to our conclusions.

Due to our resolution of the preemption issues, we need not address the other issues raised by the parties. See Tex. R. App. P. 47.1.